UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X    05 CV 2464 (NG) (RER)
JAIME CHAVEZ,

        **Plaintiff,**

 -against-               **OPINION AND ORDER**

**IBERIA FOODS CORP., a wholly owned
subsidiary of BROOKLYN BOTTLING CO. OF
MILTON, N.Y., INC., and BROOKLYN
BOTTLING CO. OF MILTON, N.Y., INC., the
parent company of IBERIA FOODS CORP.,**

        **Defendants.**
------------------------------------------------------------------X

**GERSHON, United States District Judge:**

  Jaime Chavez brings this action against Iberia Foods Corp. ("Iberia") and Brooklyn Bottling Co. of Milton, N.Y., Inc. ("Brooklyn Bottling") alleging: (1) discrimination and retaliation based on race and ethnicity under 42 U.S.C. § 1981, New York State Human Rights Law §§ 290 et seq. ("NYSHRL"), and New York City Human Rights Law, Administrative Code §§ 8-101 et seq. ("NYCHRL") and (2) discrimination and retaliation based on national origin and age under NYSHRL and NYCHRL. Defendants Iberia and Brooklyn Bottling move for summary judgment pursuant to Federal Rule of Civil Procedure 56 on all of Mr. Chavez's claims.

**I. FACTS**

Unless otherwise indicated, the following facts are undisputed.

Plaintiff Jaime Chavez was born in Lima, Peru in 1960. Mr. Chavez has a Bachelor's Degree in Business Administration, a Masters of Science Degree in Community Economic Development, and has finished three years of post graduate studies in International Marketing. Chavez Dep. 12-13. In 1994, Mr. Chavez began working for Iberia, a company that sells and distributes ethnically-based

food products to South American and Central American communities located in, among other areas, the metropolitan New York area. Miller Aff. ¶ 5; Chavez Dep. 19. One year later, in 1995, Mr. Chavez was promoted to the position of Area Sales Manager. Chavez Dep. 20.

In January 2003, PDM Holding Corp. ("PDM") purchased the stock and certain assets of Iberia. Miller Aff. ¶ 1. PDM is wholly owned by Eric Miller, who also owns and is president of several other companies that specialize in the business of distributing ethnically-based food and beverages catering primarily to South American, Central American, and Caribbean communities throughout the metropolitan New York area, Florida, and various other states. Miller Aff. ¶ 2, 3, and 4.

As part of Iberia's sale, PDM retained Mr. Chavez, as well as other employees, to work as Area Sales Managers. When Mr. Chavez applied to be retained by PDM, he asked for a salary of $45,000. Groh Aff. Ex. F. As part of the Iberia purchase agreement, Mr. Chavez claims that PDM agreed to provide the same benefits and bonuses to the employees as they had received before.

Mr. Chavez's direct supervisor both before and immediately after the sale of Iberia was Mr. Estelio "Steve" Cabarcus, who is of Columbian national origin. Chavez Dep. 31, 70; Miller Aff. ¶ 11. Mr. Cabarcus's direct supervisor after Iberia's sale was Mel Feldman. Miller Aff. ¶ 11. In February 2003, Mr. Cabarcus gave notice of his resignation. Miller Aff. ¶ 12; Feldman Dep. 21; Feldman Aff. ¶ 15. When Mr. Chavez learned of Mr. Cabarcus's resignation, Mr. Chavez told Mr. Feldman that he was interested in filling Mr. Cabarcus's position. Chavez Dep. 73-75; Feldman Dep. 105-106.

In March 2003, Mr. Feldman, a self-described white anglo, gave Mr. Cabarcus's old job to Carlos Diaz instead of Mr. Chavez. Feldman Dep. 15, 25-26. Mr. Diaz is Uruguayan by birth and has a high school education. Diaz Dep. 7. Like Mr. Chavez, Mr. Diaz was an Area Sales Manager with Iberia prior to Iberia's sale in January 2003. Chavez Dep. 107. Mr. Diaz became an area sales manager for Iberia in 1998 and was trained by Mr. Chavez for several weeks when Mr. Diaz first started work. Chavez Dep. 106; Diaz Dep. 61-62.

Mr. Feldman explained in his March 13, 2006 deposition that he chose Mr. Diaz over Mr. Chavez because he believed that Mr. Diaz was more responsive and had a better attitude. However, in an affidavit dated November 15, 2006, the sole reason that Mr. Feldman offered for choosing Mr. Diaz instead of Mr. Chavez was that Mr. Diaz was better suited geographically to supervise the other New York area sales managers. Feldman Aff. ¶ 17. Mr. Diaz lived in Leonia, New Jersey, at the time while Mr. Chavez lived in Hartford, Connecticut. Miller Aff. ¶ 15. As in his complaint, Mr. Chavez states in his affidavit that living in Connecticut never prevented him from performing his job duties in New York. Chavez Aff. ¶ 5.

When Mr. Feldman told Mr. Chavez that he had decided to give the job to Mr. Diaz, Mr. Chavez complained to Mr. Feldman that he felt discriminated against based on age.[1] Mr. Chavez was upset that Mr. Diaz, a person whom Mr. Chavez had helped to train, would be promoted ahead of him. During this conversation, Mr. Feldman and Mr. Chavez discussed promoting Mr. Chavez

---

[1]In his affidavit, Mr. Chavez claims that he complained to Mr. Feldman that he felt discriminated against based on "age and heritage." This claim, however, is not supported by Mr. Chavez's deposition testimony or previous statements. *See* discussion *infra* Part II.B.1.

to a position in Connecticut that would be comparable to Mr. Diaz's position in New York.[2]  Chavez Dep. 79-81.  During the first week of April 2003, however, Mr. Miller chose Andre Madero for the position in Connecticut instead of Mr. Chavez.[3]  Miller Aff. ¶ 19.  Mr. Madero is of Colombian national origin and was born in 1966.  Madero Dep. 14.  Prior to working at Iberia, Mr. Madero worked at a company called MASAS, a distributing company where Mr. Madero had connections to Price Right, Stop & Shop, Shaws, and Expect Discount.  Madero Dep. 8.[4]  Mr. Madero also had five years experience as a district sales manager for Coca Cola in Connecticut.  Madero Dep. 11, 16.  Mr. Miller claims that he chose Mr. Madero over Mr. Chavez so that Iberia could get access to the accounts that Mr. Madero said he had access to during his previous employment.  Miller Aff. ¶ 19.

In April 2003, Mr. Chavez wrote two letters to Mr. Feldman complaining that the area sales managers were not getting the bonuses and benefits that PDM had promised them at the time that PDM had purchased Iberia.  Chaiet Aff. Ex. B, D.  Neither of these letters mention discrimination, nor do they claim that some area sales managers were receiving benefits and bonuses while other area sales managers were not.  Moreover, Mr. Chavez has presented no evidence that *any* area sales manager–even the sales managers who were promoted instead of him–received bonuses or benefits in 2003.

---

[2] Mr. Chavez claims that Mr. Feldman "promised" him this job and announced to others that Mr. Chavez would receive the job.

[3] Mr. Madero contacted Mr. Feldman in March 2003 to inquire about transferring from MASAS to Iberia.  Although Mr. Feldman, based on this conversation, recommended that Mr. Miller meet with Mr. Madero, the record shows that Mr. Miller made the decision to hire Mr. Madero.  Feldman Dep. 80; Feldman Aff. ¶ 24; Miller Aff. ¶ 19.

[4] In his affidavit, Mr. Chavez–who went to MASAS and took Mr. Madero's position–contests Mr. Madero's representation that he was a vice-president at his previous company.  Chavez Aff. ¶¶ 2-4.  However, Mr. Chavez does not contest Mr. Madero's claim that he had access to the accounts just listed.

Mr. Chavez claims that Mr. Feldman retaliated against him in response to his complaint about not getting a promotion and in response to his complaints about bonuses and benefits. According to Mr. Chavez, Mr. Feldman retaliated by unreasonably increasing the scope of Mr. Chavez's employment activities, without an increase in pay, to include sales solicitations, management, and distribution of products in the Bronx and Manhattan. Notably, however, the increase in Mr. Chavez's employment responsibilities began sometime at the end of January or the first two weeks of February, Chavez Dep. 64, 112, well before Mr. Chavez made his first complaints to Mr. Feldman at the end of February. Chavez Dep. 78. Mr. Chavez also claims that Mr. Feldman retaliated by calling him late at night, outside business hours. Mr. Matos, one of Mr. Chavez's co-workers, claims that Mr. Feldman never called him late at night. Matos Aff. ¶ 16. However, Mr. Diaz and Mr. Madero, the two employees who were promoted instead of Mr. Chavez, both testified that Mr. Feldman called them about business late at night and early in the morning. Diaz Dep. 138-39; Madero Dep. 39-40.

Mr. Chavez further claims that Mr. Feldman and some other employees joked about his accent and pronunciation and called him "F----g Peruvian" or "Stupid Peruvian" at least three times in response to his complaints about not being promoted. Chavez Dep. 130-31, 149; Chavez Aff. ¶ 21. Mr. Matos, one of Mr. Chavez's co-workers, also heard these comments and testified that Mr. Feldman did not treat any other sales managers in the same way. Matos Aff. ¶ 17.

Based on the alleged retaliatory actions and Mr. Feldman's failure to promote him, Mr. Chavez claims that he was effectively forced to resign. In April 2003, Mr. Chavez gave written notice of his resignation to Iberia.

## II. DISCUSSION

## A. Summary Judgment Standards

Motions for summary judgment are granted if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *Lipton v. Nature Co.*, 71 F.3d 464, 469 (2d Cir. 1995). The moving party must demonstrate the absence of any material factual issue genuinely in dispute. *Id.* The court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, the non-moving party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986). The party must produce specific facts sufficient to establish that there is a genuine factual issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In a discrimination action such as this, it is important to note that:

> [a] victim of discrimination is . . . seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence . . . [W]here a defendant's intent and state of mind are placed at issue, summary judgment is ordinarily inappropriate.

*Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991) (citations omitted). On the other hand, "[t]he summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985). Therefore, in the discrimination context, a plaintiff "must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997).

## B. Mr. Chavez's Claims Under § 1981

To establish a claim under § 1981, a plaintiff must show that: (1) he is a member of a racial

minority; (2) the defendant had an intent to discriminate on the basis of race; and (3) the discrimination concerned one or more activities enumerated in the statute. *Lauture v. Int'l. Bus. Mach. Corp.*, 216 F.3d 258, 261 (2d Cir. 2000). Retaliation and discrimination claims under § 1981 are analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Citroner v. Progressive Cas. Ins. Co.*, 208 F.Supp.2d 328, 342 (E.D.N.Y. 2002); *see Lizardo v. Denny's*, 270 F.3d 94, 103 (2d Cir. 2001). The plaintiff must first establish a prima facie case. *Texas Dept. Of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981). Once a prima facie case has been established, the employer must articulate a legitimate, non-discriminatory reason for having taken the action of which the plaintiff complains. *Id.*; *McDonnell-Douglas Corp.*, 411 U.S. at 802-03; *Johnson v. Palma*, 931 F.2d 203, 207 (2d Cir. 1991). If this is done, the burden shifts back to the plaintiff to prove that the allegedly legitimate reason is merely a pretext for discrimination. *McDonnell-Douglas Corp.*, 411 U.S. at 804. However, "a reason cannot be proved to be a 'pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (citation omitted); *see also Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 146 (2000) (holding that the fact-finder may infer discrimination from the falsity of the employer's explanation). In the summary judgment context, *St. Mary's* requires a plaintiff to "establish a genuine issue of material fact either through direct, statistical or circumstantial evidence as to whether the employer's reason for discharging her is false and as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision." *Gallo v. Prudential Residential Serv. Ltd., P'ship*, 22 F.3d 1219, 1225 (2d Cir. 1994).

    1.    <u>Mr. Chavez's Retaliation Claims</u>

Defendants are entitled to summary judgment with respect to Mr. Chavez's § 1981 retaliation

7

claim because the alleged retaliation was in response to Mr. Chavez's complaints of *age* discrimination. "To be actionable under § 1981, the retaliation must have been in response to the claimant's assertion of rights that were protected by § 1981." *Hawkins v. 1115 Legal Serv. Care*, 163 F.3d 684, 693 (2d Cir. 1998) (holding that retaliation in response to complaints of gender discrimination falls outside the scope of § 1981 because § 1981 deals with race-based discrimination). Section 1981 was enacted to prevent discrimination on the basis of race or ethnic characteristics and does not apply to age discrimination. *St. Francis College v. Al-Khazraji*, 481 U.S. 604, 609, 611, 613 (1987); *Parker v. Metro. Transp. Auth.*, 97 F.Supp.2d 437, 452 (S.D.N.Y. 2000); *see Lauture*, 216 F.3d at 261. Mr. Chavez stated in his deposition that, when he learned of Mr. Diaz's promotion, he complained to Mr. Feldman that he felt discriminated based on age and that he did not mention nationality. Chavez Dep. 78-81. Even in response to his own counsel's deposition questions, Mr. Chavez stated that, when he learned of Mr. Diaz's promotion, he complained to Mr. Feldman about age discrimination, not race or ethnic discrimination. Chavez Dep. 139. Furthermore, the two letters in which Mr. Chavez complained to management about denial of benefits and bonuses contained no reference to racial or ethnic discrimination. Nor did Mr. Chavez's resignation letter include any complaint of racial or ethnic discrimination. Mr. Chavez's complaints of age discrimination therefore fall outside the scope of § 1981, and Mr. Chavez's claim that he experienced retaliation based on his complaints of age discrimination is not cognizable under § 1981.[5]

---

[5]Although Mr. Chavez states in his affidavit that he complained to Mr. Feldman about discrimination based on *both* age and heritage, this statement is inconsistent with his previous statements, as outlined above. "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Perma Research and Dev. Co. v. Singer Co.*, 410 F.2d 571, 578 (2d Cir. 1969). In *Brown v. Henderson*, 257 F.3d 246, 256 (2d Cir. 2001), the court affirmed summary judgment in a Title VII

8

2. Mr. Chavez's Discriminatory Promotion Claim

As a preliminary matter, defendants argue that Mr. Chavez has failed to establish a discriminatory promotion claim under § 1981 because he has failed to establish (1) that the promise or denial of a promotion is the sort of contractual activity enumerated in § 1981 and (2) that he belongs to a racial minority. First, Congressional amendments to § 1981 indicate that the statute is intended to prohibit race-based failure to promote. *Hawkins v. 1115 Legal Serv. Care*, 163 F.3d 684, 693 (2d Cir. 1998) (noting that Congress amended § 1981 to clarify that the statute covers the "modification . . . and enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship" and that legislative history indicates that this amendment was intended to cover discriminatory failure to promote). Second, although § 1981 does not prohibit discrimination based on national origin, race-based discrimination for the purposes of § 1981 includes discrimination based on ancestry and ethnicity. *St. Francis*, 481 U.S. at 613; *see Albert v. Carovano*, 851 F.2d 561, 572 (2d Cir. 1988) (noting that Section 1981 was intended to combat "racial or ethnic

---

sex discrimination case where the plaintiff had repeatedly stated that she was harassed because of a union dispute, not because of her sex. The court in *Brown* noted that "we are reluctant to allow [the plaintiff] to rescue her claim with a last-minute conversion to the position that, instead of what she had consistently said before, she faced adverse conditions because she is a woman." *Id.* at 256. Similarly, Mr. Chavez's last-minute conversion to the position that the defendants retaliated against him based on complaints of ethnic discrimination–as opposed to age discrimination–is insufficient to survive a summary judgment motion.

Furthermore, the timing of events and interactions does not support Mr. Chavez's argument that the defendants retaliated against him based on complaints of ethnic discrimination, as opposed to age discrimination. In his deposition and affidavit, Mr. Chavez testified that the alleged jokes about his accent and heritage occurred *after* he had complained to management about not being promoted. *See* Chavez Dep. 149; Chavez Aff. ¶ 21. Because this alleged ethnic discrimination occurred after the promotion decision was made, any complaint that Mr. Chavez might have made about these jokes could not have influenced management's not to promote Mr. Chavez. Moreover, the alleged retaliatory acts–increasing Mr. Chavez's workload without pay, denying Mr. Chavez benefits and bonuses, etc.–started before Mr. Chavez was passed over for promotion. Accordingly, these alleged retaliatory acts could not have been in response to any alleged complaints by Mr. Chavez of ethnic discrimination.

discrimination"). Because Mr. Chavez's discriminatory promotion claim fails for other reasons, the court need not decide whether his self-described status as a native Peruvian of Peruvian heritage constitutes an ethnic classification or a classification based solely on national origin.

Assuming for the sake of argument that Mr. Chavez has established that he is a member of a racial minority, defendants are still entitled to summary judgment with respect to his discriminatory promotion claim because Mr. Chavez has failed to carry his burden under *McDonnell-Douglas*. Even if Mr. Chavez has established a prima facie case of discriminatory promotion, defendants are entitled to summary judgment because defendants have provided legitimate, non-discriminatory reasons for their promotion decisions, and Mr. Chavez has failed to offer sufficient facts to prove that these reasons are pretextual and that discrimination was the true reason. Defendants claim that Mr. Diaz was promoted instead of Mr. Chavez because Mr. Diaz lived geographically closer to Iberia's New York headquarters and distribution points. Mr. Diaz lived in northern New Jersey, while Mr. Chavez lived in Hartford, CT, approximately 110 miles away from New York City.[6] Miller Aff. ¶ 15. Defendants claim that Mr. Madero was chosen instead of Mr. Chavez because defendants believed that Mr. Madero could bring new accounts to Iberia based on his previous work experience for a different company. In his deposition, Mr. Madero claimed to have connections through his previous work to Price Right, Stop & Shop, Shaws, and Expect Discount. Madero Dep. 8.

Given these two legitimate, non-discriminatory reasons for promoting Mr. Madero and Mr. Diaz instead of Mr. Chavez, the burden shifts back to Mr. Chavez to prove that these reasons are pretextual. *McDonnell-Douglas Corp.*, 411 U.S. at 804. In arguing that the defendants' reasons are

---

[6]Mr. Feldman testified in his deposition that he chose Mr. Diaz instead of Mr. Chavez because Mr. Feldman believed that Mr. Diaz was more responsive and had a better attitude. Although this reason differs from that given in his affidavit, it is not necessarily an inconsistent explanation.

10

pretext, Mr. Chavez reiterates that he was better qualified in terms of experience and education and that it was general policy for Iberia to promote employees within the company rather than hire laterals, as it did with Mr. Madero.[7] However, Mr. Chavez's argument ignores that a business manager may exercise his business judgment to choose freely among qualified candidates. Although "disregard or misjudgment of a plaintiff's job qualifications may undermine the credibility of an employer's stated justification for an employment decision," a "court must respect the employer's unfettered decision to choose among qualified candidates." *Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001) (internal citations and quotations omitted). If a plaintiff tries to establish, based solely on a discrepancy in credentials, that a defendant's explanation is pretextual, the plaintiff must show that his credentials are so far superior that "no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Id.* (internal citations and quotations omitted). Mr. Chavez has failed to come close to such a showing. All three candidates–Mr. Diaz, Mr. Madero, and Mr. Chavez–had many years experience in sales and in management. Mr. Madero had five years experience as a district sales manager for Coca-Cola in Connecticut, as well as several years experience at a food distribution company called MASAS. Madero Dep. 8, 11, 16. Furthermore, Mr. Diaz and Mr. Chavez both had equal status as Area Sales Managers for Iberia at the time that Mr. Diaz was promoted. A reasonable person very well could have chosen Mr. Diaz over Mr. Chavez because of Mr. Diaz's more advantageous geographic location and could have chosen Mr. Madero over Mr.

---

[7]Mr. Chavez also claims that Mr. Diaz never met his sales goals or numbers and was involved in a motor vehicle accident while driving a company car, Chavez Aff. ¶ 6, but Mr. Chavez fails to set forth specific facts or other evidence to support these allegations. Mr. Chavez provided no sales figures to indicate that Mr. Chavez met his goals while Mr. Diaz failed to do so and did not elicit such information from Mr. Diaz. In his deposition, Mr. Diaz concedes that he did not meet his sales goals for 2004, but that was well after the relevant promotion decision was made in 2002.

Chavez because of Mr. Madero's claimed connection to new potential accounts.[8]

Nor can Mr. Chavez prove that the defendants' reasons for choosing Mr. Madero and Mr. Diaz are pretext by relying on the fact that Mr. Feldman and other, unidentified employees joked about Mr. Chavez's accent and heritage on "at least three" occasions. "Proof of pretext cannot rest upon" statements by non-decisionmakers or "'statements by decisionmakers unrelated to the decisional process itself . . . .'" *Layou v. Xerox Corp.*, 999 F.Supp. 426, 433 (W.D.N.Y. 1998) (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring). Moreover, "[t]o be probative of discrimination, isolated comments must be contemporaneous with the [decision in question] or causally related to the decision making process." *Layou*, 999 F.Supp. at 433. Accordingly, to the extent that the other, unidentified employees who joked about Mr. Chavez's accent and heritage were not involved in the decision making process, Mr. Chavez cannot rely on their statements to establish that the defendants' reasons for promoting Mr. Diaz and Mr. Madero were pretextual. Furthermore, even though some of the comments were made by Mr. Feldman, the decision-maker who chose to promote Mr. Diaz, the comments were not causally related or contemporaneous to the promotion decisions. Mr. Chavez's own affidavit asserts that the joking about his accent and heritage occurred as a *retaliation* to his complaints about not being promoted, *after* the decision to promote Mr. Diaz was already made. Chavez Aff. ¶ 21. Moreover, Mr. Miller was the decision maker–not Mr. Feldman–in choosing Mr. Madero for the second

---

[8]Mr. Chavez claims in his affidavit that living in Connecticut never affected or impaired his ability to work in New York. However, Mr. Chavez has failed to point to specific facts to support this conclusory statement. Mr. Chavez has not included any performance evaluations, sales statistics, or other documents, and his self-serving affidavit provides no more support for his claim than does his pleading. Accordingly, Mr. Chavez has failed to raise a genuine issue of fact sufficient to survive summary judgment. *Elliott v. British Tourist Auth.*, 172 F.Supp.2d 395, 403 (S.D.N.Y. 2001) (denying summary judgment where the plaintiff in an age discrimination case relied on a conclusory affidavit that failed to set forth basic, specific facts such as the identity of the plaintiff's alleged younger replacement).

position, and Mr. Chavez has offered no evidence that Mr. Miller ever made any comments or was aware of any comments about Mr. Chavez's accent or heritage. In sum, the comments about Mr. Chavez's heritage and accent either were not made by decision-makers or were not causally related or contemporaneous to the promotion decisions. As described below, even if the remarks, despite their timing, are treated as reflective of ethnic or racial animus toward Mr. Chavez, they are insufficient to warrant denial of summary judgment.

Even assuming for the sake of argument that Mr. Chavez were able to prove that the defendants' reasons for promoting Mr. Diaz and Mr. Madero were pretextual, defendants would still be entitled to summary judgment because Mr. Chavez is unable to meet the ultimate burden of establishing that "the defendant intentionally discriminated against the plaintiff." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143 (2000). A plaintiff may be able to survive a defendant's motion for summary judgment motion by presenting a prima facie case and evidence of pretext. *Schnabel v. Abramson*, 232 F.3d 83, 90 (2d Cir. 2000). However, the Supreme Court has cautioned "there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." *Reeves*, 530 U.S. at 148. "In short, the fact that the proffered reason was false does not necessarily mean that the true motive was the illegal one argued by the plaintiff." *Fisher v. Vassar Coll.*, 114 F.3d 1332, 1338 (2d Cir. 1997). "'[W]hether judgment as a matter of law is appropriate in any particular case' depends on a careful review of the total evidence adduced, including 'the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law.'"

13

*Cross v. New York City Transit Auth.*, 417 F.3d 241, 249 (2d Cir. 2005) (quoting *Reeves*, 530 U.S. at 148-49). Defendants are entitled to summary judgment based on a careful review of the totality of evidence if "no rational factfinder could conclude that the action was discriminatory." *Reeves*, 530 U.S. at 148.

After carefully reviewing the totality of evidence in this case, I find that no rational factfinder could conclude that discrimination was the true reason that the defendants chose to promote Mr. Diaz and Mr. Madero instead of Mr. Chavez. The very essence of defendants' business is the distribution of ethnically-based food and beverages to South American, Central American, and Carribean communities in the New York metropolitan area, among other places. Although Mr. Chavez–a South American of Peruvian ancestry and heritage–was denied a promotion and was later subjected to derogatory comments about his accent and heritage, the people promoted instead of him were also of South American heritage. Moreover, like Mr. Chavez, the people who were promoted instead of Mr. Chavez had many years of relevant experience in sales; Mr. Madero had five years experience as a district sales manager for Coca Cola in Connecticut and two years experience at MASAS while Mr. Diaz had five years experience as an Iberia Area Sales Manager. Furthermore, the defendants have offered two non-discriminatory reasons–geographic location and access to new accounts–for choosing Mr. Madero and Mr. Diaz instead of Mr. Chavez. Additionally, none of the letters that Mr. Chavez wrote to the defendants after he was denied his promotions includes any kind of reference to ethnic discrimination. Even considering the discrepancy between Mr. Feldman's deposition and affidavit regarding the reason for choosing Mr. Diaz, the evidence does not support an inference that ethnic discrimination was the true reason that Mr. Diaz and Mr. Madero were promoted instead of Mr. Chavez, and Mr. Chavez has failed to satisfy his ultimate burden of

establishing that the defendants intentionally discriminated against him. Accordingly, defendants are entitled to summary judgment with respect to Mr. Chavez's § 1981 discriminatory promotion claim.

### 3. Mr. Chavez's Discrimination Claim With Regard to Benefits and Bonuses

Assuming that access to benefits and bonuses is protected by § 1981, Mr. Chavez has failed to establish discrimination under §1981 based on the defendants' alleged denial of benefits and bonuses because he has not shown that he was denied them under circumstances giving rise to an inference of discrimination. The undisputed evidence establishes that *no* employees received bonuses in the year immediately following Iberia's sale. Even Mr. Diaz and Mr. Madero–the employees promoted instead of Mr. Chavez–do not claim to have received a bonus. In sum, Mr. Chavez has failed to show that he was treated any differently from any other employee with regard to benefits and bonuses. In his brief, Mr. Chavez for the first time suggests that the discrimination by defendants was against *all* employees, who were principally of South American ancestry. However, Mr. Chavez has failed to identify any specific facts that would give rise to an inference that the defendants were motivated by racial animus when acting toward *all* of their employees. Notably, when Mr. Chavez and other employees complained to the defendants about benefits and bonuses, their letters included absolutely no reference to discrimination, racial or otherwise. Accordingly, Mr. Chavez has failed to demonstrate an inference of discrimination, and defendants are entitled to summary judgment.

### 4. Mr. Chavez's Constructive Discharge Claim

Defendants are also entitled to summary judgment with respect to Mr. Chavez's constructive discharge claim. Constructive discharge claims "must be dismissed as a matter of law unless the

evidence is sufficient to permit a rational trier of fact to infer that the employer deliberately created working conditions that were so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 361 (2d Cir. 1993).[9] A discriminatory denial of a promotion, without more, does not amount to a constructive discharge. *Grant v. Morgan Guar. Trust Co. of New York*, 638 F.Supp. 1528, 1538 (S.D.N.Y. 1986). Thus, even assuming that Mr. Chavez was denied a promotion for discriminatory reasons, that does not by itself amount to constructive discharge.

Mr. Chavez has simply failed to show evidence of working conditions so intolerable that a reasonable person in his shoes would have felt compelled to resign. A plaintiff generally cannot establish a constructive discharge claim merely by offering evidence that he was dissatisfied with his work assignments, that he felt his work was unfairly criticized, or that his work conditions were difficult or unpleasant. *Stetson*, 995 F.2d at 360. Mr. Chavez's complaint about the increased geographic scope and nature of his work assignments–that his sales area was increased to include the sale, management, and distribution of products in the Bronx and Manhattan without an increase in pay–does not establish a situation so intolerable that a reasonable person would be compelled to resign.

Nor do Mr. Chavez's assertions that he "was ridiculed by the White Managers" and that Mr. Feldman questioned "Mr. Chavez's integrity and honesty," Pl. Br. 23, establish a claim for constructive discharge. These claims presumably arise out of Mr. Feldman reprimanding Mr.

---

[9]The standard for constructive discharge is the same under both § 1981 and Title VII. *Murray v. Bd. of Educ. of the City of New York*, 984 F.Supp. 169 (S.D.N.Y. 1997).

Chavez for submitting an expense voucher for washing his company vehicle and for allegedly failing to visit customers. Chavez Dep. 117-118. Drawing every inference in favor of Mr. Chavez, these reprimands are simply insufficient to establish that a reasonable person would have felt compelled to resign. *Spence v. Maryland Cas. Co.*, 995 F.2d 1147, 1150-52, 1156-57 (2d Cir. 1993) (affirming a district court's holding that plaintiff had not established a constructive discharge claim even though the plaintiff's employer repeatedly criticized the plaintiff's work performance and style, yelled at plaintiff in front of others, pounded his fist on a table, and repeatedly threatened to fire plaintiff).

Mr. Chavez's claim that the defendants deprived him of the bonuses and health benefits that he was entitled to is also insufficient to establish a constructive discharge claim. As described above, the other employees also did not receive bonuses and health benefits, Def. Ex. B, Diaz Dep. 105, Madero Dep. 30, and there is no evidence that these employees felt compelled to resign as a result. Similarly, Mr. Chavez's claim that Mr. Feldman called him late at night and early in the morning is insufficient to establish his claim for constructive discharge. Even Mr. Diaz and Mr. Madero–the two employees who Mr. Chavez asserts were discriminatorily promoted instead of him–state that Mr. Feldman called them late at night. Diaz Dep. 138-39; Madero Dep. 39. In short, Mr. Chavez was treated in the same way as other employees who chose not to resign.

As part of his constructive discharge claim, Mr. Chavez also asserts that the defendants unilaterally reduced his base salary from $51,000 to $45,000 at the time of Iberia's sale. However, during his deposition, Mr. Chavez conceded that his base salary remained the same before and after

17

Iberia's sale.[10] Chavez Dep. 55-56. Moreover, when he applied to be retained as an employee at the time of Iberia's sale, Mr. Chavez listed $45,000 as his desired salary. Groh Aff. Ex. F.

Mr. Chavez's claim that Mr. Feldman and some other employees made jokes about his accent and ethnicity "once in a while," Chavez Dep. 130-31, is also insufficient to establish a claim for constructive discharge. To establish a hostile work environment or constructive discharge claim, a plaintiff must show "more than a few isolated incidents of racial enmity." *Arroyo v. WestLB Admin., Inc.*, 54 F.Supp.2d 224, 229, 232-233 (S.D.N.Y 1999) (noting that a plaintiff can base a constructive discharge claim on the same sort of facts as a hostile work environment claim, but that the plaintiff may have to prove even *greater* severity or pervasiveness of harassment to establish his constructive discharge claim), *aff'd* 213 F.3d 625 (2d Cir. 2000). "[I]nstead of sporadic racial slurs, there must be a steady barrage of opprobious racial comments." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (internal citations and quotations omitted). The court in *Arroyo* granted an employer summary judgment as to an employee's constructive discharge claim despite the fact that a co-worker called the employee an "f-----g spic," a "wetback," and an "asshole" on three separate occasions. 54 F.Supp.2d at 226-228. As in *Arroyo*, Mr. Chavez's claim that Mr. Feldman and other employees "once in a while" made fun of his accent and pronunciation and used racial slurs on "at least three" occasions does not establish a constructive discharge claim.[11]

---

[10]Mr. Chavez made inconsistent statements in his deposition. At one point, he claimed that his annual income before Iberia's sale was $51,000. Chavez Dep. 20. At a different point in time, Mr. Chavez claimed that he earned $48,500 before Iberia's sale. *See* Groh Aff. Ex. E, Mr. Chavez's 2002 W-2 form. At another point during his deposition, Mr. Chavez stated that his base salary after Iberia's sale was $45,000 and that his base salary had remained the same both before and after Iberia's sale. Chavez Dep. 19, 55-56.

[11]Although Mr. Chavez claims in his affidavit that others "regularly" made fun of his accent and pronunciation and called him racial slurs, this is unsupported by his deposition testimony. Mr. Chavez's deposition testimony reveals that the joking occurred "once in a

In sum, drawing all inferences in favor of Mr. Chavez, the evidence shows the following: (1) the defendants paid Mr. Chavez the salary that he initially requested; (2) Mr. Feldman and some other employees "on at least three" occasions joked about Mr. Chavez's accent and Peruvian heritage; (3) the defendants treated Mr. Chavez like other employees who did not resign in that the defendants called Mr. Chavez about work-related matters outside of business hours and did not provide Mr. Chavez with benefits and bonuses; (4) the defendants told Mr. Chavez not to use company funds to wash his company car; (5) the defendants chose to promote Mr. Diaz, a sales manager of Uruguayan origin, and Mr. Madero, a sales person of Columbian heritage, instead of Mr. Chavez; and (6) the defendants increased the geographic scope of Mr. Chavez's sales area, but did not increase his pay. Taken together, these circumstances are insufficient to establish a working environment so intolerable that a reasonable person would feel *compelled* to resign.

### C.    Plaintiff's Remaining State Claims and Defendants' Motions to Strike

Mr. Chavez has two remaining state claims, discrimination under NYSHRL and discrimination under NYCHRL**.**  As all of Mr. Chavez's federal claims have been dismissed, the court declines to exercise supplemental jurisdiction over the remaining state law claims, *see* 28 U.S.C. § 1367(c)(3), and these claims are dismissed without prejudice.

In granting defendants' summary judgment motion, the court has carefully considered defendants' motions to strike various portions of Mr. Chavez's affidavit, Mr. Matos's affidavit, and Mr. Chavez's Rule 56.1 Counterstatement. As discussed earlier, some parts of Mr. Chavez's affidavit and Mr. Matos's affidavit include inconsistencies and conclusory allegations; also, some parts of the Rule 56.1 Counterstatement contain improper arguments and conclusions. However,

---

while," Chavez Dep. 131, and on "at least three" occasions. Chavez Dep. 149.

the

court declines to strike the affidavits and counterstatement in their entirety, and accordingly, the defendants' motions to strike are denied.

**SO ORDERED.**

/s/

**NINA GERSHON**
**United States District Judge**

Dated: Brooklyn, New York
June 28, 2007